# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

## COLUMBIA DIVISION

| | |
|---|---|
| SCPH Legacy Corporation and POD Legacy, LLC, | Civil Action No.  3:16-2863-TLW |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| Palmetto Health, Practice Partners in Healthcare, Inc., Larry D. Taylor, W. Ryan Hall, Matthew Frick, and David L. Pace, | |
| Defendants. | |

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ............................................................. 1

II.     JURISDICTION AND VENUE ................................................................................. 7

III.    INTERSTATE COMMERCE ................................................................................... 7

IV.     THE PARTIES......................................................................................................... 8

        A.      Plaintiffs............................................................................................................. 8

        B.      Defendants W. Ryan Hall, Matthew Frick, and David L. Pace ............................ 9

        C.      Defendants Practice Partners and Larry D. Taylor ............................................. 11

        D.      Defendant Palmetto Health ................................................................................ 11

V.      FACTUAL ALLEGATIONS ................................................................................... 12

        A.      Relevant Markets ............................................................................................... 12

        B.      Market Structure ................................................................................................ 15

        C.      Providence's Incorporation of the Moore Clinic Physicians into its
                orthopedic business line...................................................................................... 18

        D.      Palmetto Health and Providence Discuss an Affiliation..................................... 20

        E.      Palmetto Health Approaches Providence Physicians While Engaging in
                Negotiations with Providence .............................................................................. 22

        F.      Providence Physicians and Providence Employees Engage in Conduct in
                Furtherance of the Conspiracy and in Violation of Their Fiduciary
                Obligations......................................................................................................... 24

        G.      Providence Physicians and Providence Employees Announce Their
                Resignation from Providence and Become Employed by Palmetto Health ........ 32

        H.      LifePoint and Providence Negotiations and Agreement....................................... 33

VI.     POST-ACQUISITION IMPACT ON ORTHOPEDIC SERVICES ............................. 35

VII.    DUTIES OF THE INDIVIDUAL DEFENDANTS AND PPH ..................................... 39

VIII.   BREACHES OF DUTIES ....................................................................................... 41

IX.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ............. 44

X.      DAMAGES TO PROVIDENCE ............................................................................... 47

                COUNT 1 - VIOLATION OF § 1 OF SHERMAN ACT 15 U.S.C.  1 ............... 47

                COUNT 2 - CONSPIRACY TO MONOPOLIZE HOSPITAL SERVICES
                        IN VIOLATION OF § 2  OF SHERMAN ACT, 15 U.S.C. 2................. 48

i

TABLE OF CONTENTS
(continued)

Page

COUNT 3 - MONOPOLIZATION OF HOSPITAL SERVICES IN
VIOLATION  OF § 2 OF SHERMAN ACT, 15 U.S.C. 2 ...................... 49

COUNT 4 - ATTEMPTED MONOPOLIZATION OF HOSPITAL
SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15
U.S.C. 2 ................................................................................................ 50

COUNT 5 - CONSPIRACY TO MONOPOLIZE INPATIENT
ORTHOPEDIC SURGERY SERVICES IN VIOLATION OF § 2
OF SHERMAN ACT, 15 U.S.C. 2 .......................................................... 51

COUNT 6 - MONOPOLIZATION OF INPATIENT ORTHOPEDIC
SURGERY SERVICES IN VIOLATION OF § 2 OF SHERMAN
ACT, 15 U.S.C. 2 ................................................................................... 51

COUNT 7 - ATTEMPTED MONOPOLIZATION OF INPATIENT
ORTHOPEDIC SURGERY SERVICES IN VIOLATION OF § 2
OF SHERMAN ACT, 15 U.S.C. 2 .......................................................... 52

COUNT 8 - CONSPIRACY TO MONOPOLIZE ORTHOPEDIC
SURGERY PHYSICIAN SERVICES IN VIOLATION OF § 2
SHERMAN ACT, 15 U.S.C. 2 ................................................................ 53

COUNT 9 - MONOPOLIZATION OF ORTHOPEDIC SURGERY
PHYSICIAN  SERVICES IN VIOLATION OF § 2 OF
SHERMAN ACT, 15 U.S.C. 2 ................................................................ 53

COUNT 10 - ATTEMPTED MONOPOLIZATION OF ORTHOPEDIC
SURGERY PHYSICIAN SERVICES IN VIOLATION OF § 2 OF
SHERMAN ACT, 15 U.S.C.  2 ................................................................ 55

COUNT 11 - VIOLATION OF § 7 OF THE CLAYTON ACT,  AS
AMENDED, 15 U.S.C  18 ...................................................................... 55

COUNT 12 - VIOLATION OF SOUTH CAROLINA  UNFAIR TRADE
PRACTICES ACT .................................................................................. 56

COUNT 13 - BREACH OF FIDUCIARY DUTY TO PROTECT
PROVIDENCE'S INTERESTS ............................................................... 57

COUNT 14 - AIDING AND ABETTING A BREACH OF FIDUCIARY
DUTY ..................................................................................................... 58

COUNT 15 - BREACH OF DUTY OF LOYALTY ......................................... 60

COUNT 16 - BREACH OF CONTRACT ........................................................ 62

TABLE OF CONTENTS
(continued)

Page

COUNT 17 - MISAPPROPRIATION OF CONFIDENTIAL AND
    PROPRIETARY INFORMATION ......................................................... 63

COUNT 18 - TORTIOUS OR INTENTIONAL INTERFERENCE  WITH
    CONTRACT ........................................................................................... 64

COUNT 19 - INTENTIONAL INTERFERENCE WITH PROSPECTIVE
    CONTRACTUAL RELATIONS OR ADVANTAGE ............................ 65

COUNT 20 - CIVIL CONSPIRACY .................................................................. 66

PRAYER FOR RELIEF ......................................................................................... 69

By and through their undersigned counsel, Plaintiffs SCPH Legacy Corp. formerly known as Sisters of Charity Providence Hospitals ("Providence Hospital") and POD Legacy, LLC, formerly known as Providence Orthopaedic Group, LLC ("Providence Orthopaedic Group") (collectively "Providence" or "Plaintiffs") bring this action against Defendants Palmetto Health, Practice Partners in Healthcare, Inc., Larry D. Taylor, W. Ryan Hall, Matthew Frick, and David L. Pace (collectively "Defendants").  Based on the Defendants' misconduct from at least October 1, 2014 through the present (the "Relevant Period"), Plaintiffs assert claims for: (a) conspiracy to restrain trade and monopolize, attempted monopolization, and monopolization in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; (b) the acquisition of Providence's assets in violation of § 7 of the Clayton Act, 14 U.S.C. § 18, and (c) violations of South Carolina law, including unfair competition and unfair and deceptive acts and practices in violation of South Carolina Code § 39-5-20, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty, civil conspiracy, breach of contract, misappropriation of confidential and proprietary information, tortious or intentional interference with contract, and intentional interference with prospective contractual relations or advantage.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Defendant Palmetto Health is the largest, most sophisticated and most powerful health system in the Midlands of South Carolina with annual net patient revenue exceeding $1 billion and an array of specialized services, affiliations, and resources not matched by any other hospital system in the Midlands.  Palmetto Health has 74% of the general hospital beds in Richland County, and over 51% of the beds in Richland, Lexington, Fairfield, and Kershaw counties combined, as well as the only Level III Neonatal Intensive Care Unit ("NICU"), regional perinatal center and Level I trauma center in Richland, Lexington, Fairfield, and

Kershaw counties combined, the only obstetric and pediatric service in Richland County, (for the first quarter of 2015) almost 65% of the market for inpatient acute care hospital services to residents of Richland County covered by commercial health plans, and over 51% for residents of Richland, Lexington, Fairfield, and Kershaw counties combined.

2.      Palmetto Health has monopoly power in the relevant geographic market for inpatient acute care hospital services covered by commercial health plans due to the fact that (a) access to its services has become so essential to market residents that commercial insurers have no option other than to include Palmetto Health in their networks for insureds living in that market and (b) significant financial, legal and regulatory barriers make it almost impossible for a new competitor to enter that market, giving Palmetto Health the power, should it choose to use it, to raise prices to commercial health plans and exclude competitors from products offered by commercial health plans.

3.      Beginning in 2014, to strengthen, extend and protect its monopoly, Palmetto Health secretly and illegally conspired with the other Defendants to take from Providence its orthopedic surgery business through a series of wrongful and illegal acts in order to (a) weaken Providence's ability to compete with Palmetto Health, and (b) attempt to prevent or, at least substantially weaken, any potential new competition it might face should a new competitor seek to enter the market by acquiring Providence.

4.      In October 2014, despite Palmetto Health's monopoly power over inpatient acute care hospital services generally, Palmetto Health faced competition from Providence in the market for inpatient orthopedic surgery.

5.      Providence was able to offer competition in orthopedic surgery, despite Palmetto Health's monopoly power, because Providence had spent tens of millions of dollars  beginning in

2010 to build and develop the orthopedic surgery business line of its Moore Clinic and expand the group of employed orthopedic surgeons associated with the clinic. These investments exceeded $30 million and included the purchase of the assets related to the practice of the Moore Orthopaedic Clinic, P.A. and the development of the Austin Moore Orthopaedic Institute (the "Moore Institute") at Providence's north east hospital in Richland County, Providence Northeast. At the request of the orthopedic surgeons of the Moore Clinic, Providence had abandoned its obstetrics line of business at Providence Northeast in December 2011 and, at great expense, converted the area that had been devoted to obstetrics to orthopedic surgery.

6.      Providence's investment in the Moore Institute had paid off.  Providence's orthopedic practice was its most profitable line of business by 2014 and was critical to Providence's long term survival and ability to compete in the market dominated by Palmetto Health's monopoly.

7.      In late 2013, Providence began to consider an affiliation with other hospital systems that could provide clinical, financial, and operational resources to Providence.

8.      Palmetto Health explored the possibility of acquiring Providence.   During discussions with Providence about this, Palmetto Health became aware of Providence's financial challenges and that Providence's chief profitable service line was its orthopedic services.

9.      Palmetto Health did not want a competitor to enter the market through an acquisition of Providence, nor did it want Providence to have access to additional resources that might enable Providence to compete more effectively with Palmetto Health's monopoly.  Thus, Palmetto Health decided, beginning in or about the fall of 2014, to attempt secretly to acquire Providence's orthopedic surgery business so that (a) Providence would not be attractive to competitors who might consider purchasing Providence as a way to enter the market Palmetto

3

Health had monopolized, (b) in any event, Providence would be severely weakened and much less of a competitive threat to Palmetto Health's monopoly, and (c) Palmetto Health's monopoly would be protected and also extended and enhanced to include orthopedic surgery.

10.    In pursuit of these objectives, Palmetto Health entered a conspiracy with the other Defendants.  As part of this conspiracy and in pursuit of its objectives, Palmetto Health took significant, illegal steps including, without limitation: (i) inducing Providence executives and employees to breach their contractual and fiduciary obligations to Providence and aiding and abetting them in their breach; (ii) inducing Providence executives to persuade Providence's orthopedic physicians to breach their contractual obligations with Providence; (iii) conspiring with Providence executives and employees to facilitate Palmetto Health's acquisition of Providence's Moore Clinic orthopedic line of business, which included  its contractual relations with Providence's orthopedic physicians and other Providence personnel as well as  assets critical to Providence's orthopedic line of business, including the Moore Clinic name; (iv) interfering with Providence's prospective contractual relations with its orthopedic physicians and other Providence personnel; and (v) interfering with Providence's prospective contractual relations with entities interested in purchasing or affiliating with Providence.

11.    Palmetto Health secretly approached Providence's Moore Clinic orthopedic physicians (hereinafter the "Providence Physicians") as well as one of Providence's executives about a strategy to induce the Providence Physicians to abandon Providence and bring themselves, their clinical staff, their patients, and assets related to Providence's orthopedic line of business including the Moore Clinic name – essentially Providence's entire orthopedic business – to Palmetto Health.

12.     Palmetto Health induced Defendant W. Ryan Hall ("Hall"), and two Providence Physicians, Bradley P. Presnal ("Presnal") and Mark D. Locke, M.D. ("Locke") to conspire with it.    Between October 2014 and April 2015, Palmetto Health executives regularly met and communicated with Hall, Presnal, and Locke to carry out its conspiracy.

13.     Pursuant to the conspiracy orchestrated by Palmetto Health, Hall, Presnal, and Locke convinced Defendant Larry D. Taylor ("Taylor") of Practice Partners in Healthcare, Inc. ("PPH"), a consulting company engaged by Providence Hospital to perform healthcare consulting services, and Matthew Frick ("Frick") and David L. Pace ("Pace"), both Providence executives, to assist with sabotaging Providence's future affiliation prospects and facilitating the acquisition by Palmetto Health of Providence's orthopedic Moore Clinic line of business ,including its orthopedic physicians and their clinical staff along with the patients they served, the Moore Clinic name and related assets.

14.     Each of the Defendants other than Palmetto Health, had fiduciary obligations to Providence of trust, loyalty, good faith, candor, and due care.    Each of them breached these obligations by actively participating in the conspiracy with Palmetto Health to the detriment of and in complete disregard of Providence's best interests and by engaging in conflicts of interest, nondisclosure of material facts and transactions to Providence, as well as other improper and illegal acts described more fully below.

15.     By July 2015, the physicians of Providence's Moore Clinic, as well as Hall, Frick, Pace, and over 330 other Providence personnel had all resigned en masse from Providence to accept positions at Palmetto Health.    In addition, the physicians had exercised their right to acquire Providence's assets related to the Moore Clinic line of business including the Moore Clinic name, so that they could transfer those assets to Palmetto Health.

16.     By July 2015, Palmetto Health, acting through the Providence Physicians, had acquired in excess of $400,000 of the assets related to Providence's orthopedic business line as well as related leasehold interests of Providence, was in the process of acquiring the Moore Clinic name so that the assets and the name could be used by Palmetto Health, and was completing its hostile acquisition of the practices of the Providence Physicians.  Palmetto Health's scheme to acquire for itself Providence's Moore Clinic orthopedic line of business, and to deny this business to Providence, had succeeded.

17.     Palmetto Health's acquisition of Providence's Moore Clinic orthopedic line of business, including related assets as well as the Providence Physicians, their clinical staff, their patients and their practices (the "Acquisition"), has substantially lessened competition for orthopedic surgery services for residents of the relevant markets, denying them the benefits of that competition.  The Acquisition allowed Palmetto Health to combine the practices of the University of South Carolina Department of Orthopedic Surgery ("the USC Physicians"), the Providence Physicians from the Moore Clinic, and the other orthopedic practices associated with Palmetto Health into a single group, Palmetto Health USC Medical Group, which together includes almost 70% of the orthopedic surgeons practicing in Richland County and over 60% of the orthopedic surgeons practicing in Lexington, Richland, Fairfield & Kershaw Counties combined.

18.     The Acquisition gave Palmetto Health a dominant market share of orthopedic surgery services and orthopedic physician services for residents of the relevant geographic market.  The Acquisition has eliminated price and non-price competition among Providence Physicians and USC Physicians and created a dominant orthopedic practice.  The high level of concentration in this market resulting from the Acquisition creates a strong presumption of

anticompetitive harm.  In addition, the Acquisition will enable Palmetto Health to maintain and enhance its dominant position in the market for inpatient acute care hospital services for residents of the relevant market who are covered by commercial health plans.

## II.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this district under 28 U.S.C. § 1391 because: (a) Palmetto Health maintains its principal executive offices in this district; (b) one or more of the Defendants reside(s) in this district; and (c) a substantial portion of the transaction and wrongs complain of occurred in this district.

## III.     INTERSTATE COMMERCE

21.     Palmetto Health is engaged in interstate commerce and in activities substantially affecting interstate commerce.  The majority of Palmetto Health's and Providence's revenues derive from sources located outside of South Carolina, including payments from the federal government through Medicare and payments from out-of-state commercial payors, such as Aetna, Cigna, and United Healthcare.  This includes payments for both hospital and physician services.  As a result of the fact that much of Palmetto Health's revenues come from sources located outside of South Carolina, including payments from out-of-state commercial payors, the increase in the market power of Palmetto Health resulting from the Acquisition will substantially affect the prices and rates negotiated with commercial payors and, therefore, substantially affect Palmetto Health's revenues in interstate commerce.  Palmetto Health also spends millions of dollars on the purchase of supplies in interstate commerce.

## IV.     THE PARTIES

**A.     Plaintiffs**

22.     Plaintiff, SCPH Legacy Corp., formerly known as Sisters of Charity Providence Hospitals or Providence Hospital, is a non-profit corporation organized and existing under the laws of the State of South Carolina.  Providence Hospital provided high quality medical services and owned and operated two hospitals in Richland County:  Providence Downtown Hospital, a 258 bed hospital in Richland County, and Providence Orthopedic Northeast Hospital, a 74 bed hospital in Richland County.  Providence Hospital specialized in orthopedic and cardiac services, and had achieved significant growth in the volume of orthopedic services at its Northeast campus in the last few years.  Prior to the Acquisition, almost 90% of Providence's orthopedic surgeries were performed by the Providence Physicians of its Moore Clinic.

23.     Providence has invested many millions of dollars to improve the quality and efficiency of services offered at its hospital and facilities and has won many recent awards for its quality.

24.     Providence provided high quality services.  It was recently ranked as the second best hospital in South Carolina by *US News and World Report* and also received a four star rating, the highest rating of any hospital in the Midlands of South Carolina, from the Center for Medicare and Medicaid Services, the federal agency that manages the Medicare and Medicaid Programs.  Providence also received the Society of Thoracic Surgeons' "Highest Rated Award" of 3 stars in 2015 for the 17th consecutive year.  Providence became an Aetna Institute of Quality Orthopedic Care Facility, Total Joint Replacement beginning in 2010.  Aetna Institutes of Quality recognize hospitals that meet certain standards of quality and cost efficiency.  Factors that are measured include patient satisfaction, level of care, and how often people return to the

hospital after surgery.  In addition, Providence Orthopedic Hospital was designated by Blue Cross Blue Shield as a Blue Distinction® Center for Knee and Hip Replacement beginning in 2010.  Blue Distinction® Centers demonstrate better quality and improved outcomes for patients, resulting in lower rates of complications and healthcare associated infections than their peers. And, Providence is included in Heathgrades' list of America's 100 Best for Joint Replacement and Best Orthopedic Surgery.

25.    POD Legacy, LLC formerly known as Providence Orthopaedic Group, LLC is a limited liability company wholly owned and operated by Providence Hospital.

26.    Providence Hospital and Providence Orthopaedic Group are collectively referred to herein as "Providence."

**B.    Defendants W. Ryan Hall, Matthew Frick, and David L. Pace**

27.    Defendant W. Ryan Hall is a citizen and resident of the State of South Carolina. Hall is a former Providence employee and most recently served as the Vice President Administrator of Providence Orthopedic Northeast Hospital.  He was responsible for leading the transition team charged with establishing the Moore Clinic for Providence and was the leader of the Leadership Team charged with implementing the Strategic Plan for Providence's orthopedic business line, managing the day-to-day operations of that business line and ensuring its success, including retaining the services of the Moore Clinic Physicians.  Hall directly reported to Providence's President and Chief Executive and regularly attended Providence Hospital's Board of Trustees Meetings.  On March 27, 2015, Hall announced he was resigning from Providence effective April 24, 2015.  Soon after he resigned, he became Vice President of Orthopedics at Palmetto Health, a position that he continues to hold.

28.     Defendant Matthew Frick ("Frick") is a citizen and resident of the State of South Carolina.  Frick was employed by Providence Hospital in 2010 through June 2015 and most recently served as the Assistant Vice President of Outpatient Operations for Providence's orthopedic operations.  He was one of the three top administrators charged with administration and enhancement of Providence's Moore Center for Orthopedics.   His duties included implementing the business growth strategy and vision for Providence's Moore Center for Orthopedics as well as day-to-day supervision and management of the center.  Frick reported to Ryan Hall and attended some Providence Hospital's Board of Trustees Meetings.  Frick resigned from Providence Hospital in June 2015, ended his employment on June 19, 2015, and soon became employed by Palmetto Health, where he now works in a leadership position in the orthopedic service line.

29.     Defendant David L. Pace ("Pace") is a citizen and resident of the State of South Carolina.   Pace is a former Providence Hospital employee and most recently served as the Assistant Vice President of Support Operations for Providence's orthopedic operations.  Pace reported to Ryan Hall and attended some of Providence Hospital's Board of Trustees Meetings. He was one of the three top administrators charged with administration and enhancement of Providence's Moore Center for Orthopedics.  Among other things, his duties included assisting in the creation of "an appropriate vision and long-term strategy" for Providence's Orthopedic Service line of business and implementing the goals and objectives of Providence's orthopedic program's strategic plan.  Pace resigned from Providence Hospital in June 2015, ended his employment on June 19, 2015 and soon became employed by Palmetto Health, where he now works in a leadership position in the orthopedic service line.

### C.    Defendants Practice Partners and Larry D. Taylor

30.    Defendant Practice Partners in Healthcare, Inc. ("PPH") is a corporation organized under the laws of the State of Delaware with its principal place of business at 1 Chase Corporate Drive, Suite 200, Birmingham, Alabama 35244.  PPH entered into an agreement with Providence Hospital on January 25, 2011 (hereinafter "PPH Agreement") in which PPH agreed to serve as a consultant to Providence including consulting regarding its Moore Clinic line of business for a fee of $10,000 per month.  Under the terms and amendments, the PPH Agreement continued through April 30, 2016.  The PPH Agreement included an implied duty of good faith and fair dealing in the performance of contractual obligations.  In addition, under Section 3.2 of the PPH Agreement, PPH expressly agreed that "PPH shall act in good faith to perform its obligations hereunder."

31.    Defendant Larry D. Taylor ("Taylor") is a citizen and resident of the State of Alabama.  Taylor is the President and CEO of Defendant PPH.  Pursuant to the terms of the PPH Agreement, Taylor provided consulting services to Providence.

### D.    Defendant Palmetto Health

32.    Defendant Palmetto Health is a non-profit corporation organized under the laws of the State of South Carolina with its principal place of business in Columbia, South Carolina. Palmetto Health is by far the largest hospital system in Richland, Lexington, Fairfield and Kershaw counties, as well as the Midlands of South Carolina. It owns and operates Palmetto Health Baptist, a 287 bed hospital in Richland County; Palmetto Health Baptist Parkridge, a 76 bed hospital in Richland County; and Palmetto Health Richland, a 579 bed hospital in Richland County that includes its 163 bed Palmetto Health Children's Hospital, and its 124 bed Palmetto Health Heart Hospital.  Palmetto Health previously had an affiliation with the University of

South Carolina School of Medicine and has now merged its physician practices with those of the school of medicine creating a large physician group of over 500 physicians known as Palmetto Health USC Medical Group.  Palmetto Health also finalized its partnership with Tuomey Healthcare System in January 2016, which is now Palmetto Health Tuomey.  During fiscal year 2015, Palmetto Health generated over $1.4 billion in net patient revenue.  Palmetto Health is the only provider of obstetrics and pediatric services in Richland County and the only provider of Level III neonatal intensive care, regional perinatal care and Level I trauma services in Richland, Lexington, Fairfield and Kershaw counties.

33.     Defendants identified in ¶¶ 27 - 29 and 31 are sometimes referred to herein as the "Individual Defendants."

34.     Defendants identified in ¶¶ 27 - 29 are sometimes referred to herein as the "Former Providence Executive Defendants."

## V.     FACTUAL ALLEGATIONS

### A.     Relevant Markets

35.     The relevant geographic market in which to assess the effects of the Acquisition is no larger than Richland, Lexington, Fairfield and Kershaw Counties, South Carolina combined. Residents of Richland County generally are unwilling to leave the county to obtain inpatient acute care hospital service, inpatient orthopedic surgery services, or orthopedic physician services.  The resistance of residents of Richland County to leaving the county for any of these healthcare services is such that health plans negotiating rates for any of these healthcare services for residents of Richland County would not be able to substitute providers from outside the county in order to avoid paying a small but significant nontransitory increase in the price of those services by a hypothetical monopolist that controlled all of that service in the county.  In

addition, residents of Richland, Lexington, Fairfield and Kershaw counties combined are generally unwilling to leave that area to obtain inpatient acute care hospital service, inpatient orthopedic surgery services, or orthopedic physician services. The resistance of residents of those counties to leaving that area for any of these healthcare services is such that health plans negotiating rates for any of these healthcare services for residents of those counties would not be able to substitute providers from outside those counties in order to avoid paying a small but significant nontransitory increase in the price of those services by a hypothetical monopolist that controlled all of that service in those counties.

36.     Therefore, health plans are unable to serve their members in Richland County without including Richland County hospitals and orthopedists in their provider networks. And, health plans are unable to serve their members in Richland, Lexington, Fairfield, and Kershaw counties combined without including hospitals and orthopedists in those counties in their provider networks.

37.     There are three relevant product markets in this case: (1) general acute care inpatient hospital services; (2) inpatient orthopedic surgical services; and, (3) orthopedic surgeon physician services.

38.     General acute care inpatient hospital services include medical and surgical services that require an overnight stay.

39.     The general acute care hospital services market does not include outpatient services (those not requiring an overnight stay) because such services are offered by different competitors under different competitive dynamics. In addition, the treatment that requires an inpatient stay cannot be effectively treated on an outpatient basis. Thus, outpatient services are not reasonably interchangeable with inpatient hospital services, and health plans and patients

could not substitute outpatient services for inpatient services in response to a small but significant price increase in inpatient services.

40.     Palmetto Health's share of general acute care inpatient hospital services provided to residents of Richland County covered by commercial health plans was approximately 65% in the first quarter of 2015.  Providence had an approximate 15% share of this market.

41.      Even if the geographic market were expanded to include all of Lexington, Richland, Kershaw and Fairfield Counties, in the first quarter of 2015 Palmetto Health's share of general acute care inpatient hospital services provided to residents of that area was approximately 51% and Providence had an approximate 13%  share.

42.     The inpatient orthopedic surgical service market encompasses orthopedic surgical services offered by Providence and Palmetto Health that require an overnight stay.  Inpatient orthopedic surgical services must be provided in a hospital environment, unlike outpatient orthopedic procedures which may be offered in a hospital or in an ambulatory surgical center. Thus, outpatient orthopedic surgical services are not reasonably interchangeable with inpatient orthopedic surgical services, and health plans and patients could not substitute outpatient orthopedic surgical services or any other type of service for inpatient orthopedic services in response to a small but significant price increase for inpatient orthopedic surgical services.

43.     Palmetto Health's share of inpatient orthopedic surgical services provided to residents of Richland County covered by commercial health plans in the last quarter of  2014 was more than 46%.    Providence had an approximate 34% share. Palmetto Health's share of inpatient orthopedic surgical services provided to residents of Richland Lexington, Fairfield and Kershaw counties covered by commercial health plans for the same time period in 2014 was approximately 42%.  Providence had an approximate 30% share.

44.     The orthopedic surgeon physician services market includes surgery and other services that must be provided by physicians who specialize as orthopedic surgeons to treat injuries and diseases of the musculoskeletal system that require treatment by orthopedic surgeons.  Orthopedic surgeon physician services cannot be provided by anyone other than orthopedic surgeons.   Services provided by other persons, thus, are not reasonably interchangeable with orthopedic surgeon physician services, and health plans and patients could not substitute the services of others for orthopedic surgeon physician services in response to a small but significant price increase for orthopedic surgeon physician services.

45.     Palmetto Health, as a result of the Acquisition, now controls almost 70% of the orthopedic surgeons who practice in Richland County and over 60% of the orthopedic surgeons who practice in Richland, Lexington, Fairfield and Kershaw Counties.

**B.     Market Structure**

46.     There are five hospitals in Richland County providing inpatient acute care hospital services to patients covered by commercial health plans:  three Palmetto Health facilities (Palmetto Health Baptist, Palmetto Health Richland, and Palmetto Health Parkridge) and two Providence facilities (Providence Hospital, and Providence Hospital Northeast).

47.     Prior to the Acquisition, Palmetto Health and Providence were close competitors for inpatient orthopedic surgical services provided to residents of the relevant market.  A merger of close competitors increases the likelihood that the merging parties can increase prices for orthopedic services after the merger.

48.     Prior to the Acquisition, competition among orthopedic surgeons, including the Moore Clinic orthopedic surgeons, in Richland County was robust.  At that time, 43 orthopedic surgeons in 9 practices competed to serve orthopedic patients.  Competition among orthopedic

surgeons in Richland, Lexington, Fairfield and Kershaw counties was also robust, with 52 orthopedic surgeons in 12 practices competing to serve orthopedic patients.

49.     Competition for healthcare services – including hospital services and physician services – occurs in two stages.  In the first stage, hospital and physician providers compete for selection by health plans as in-network providers.  To become an in-network provider, hospitals and physicians negotiate with health plans and then enter into a contract recognizing the provider as in-network.  During the negotiations, the provider and health plan agree on the reimbursement rates that the health plan will pay to the provider when the health plan's members obtain care from the provider.

50.     Hospitals and physicians benefit from in-network status by gaining access to the health plan's members as patients.  Likewise, health plans benefit by being able to create commercially marketable and appealing provider networks to employers and their employees.

51.     Changes in reimbursement rates negotiated between providers and health plans impact the health plan's members.

52.     Self-insured employers rely on a health plan for access to the provider network and the health plan's negotiated rates, but these employers also pay their employees' healthcare claims directly.  Thus, self-insured employers, not commercial insurance companies, bear the burden of any increases in the rates applicable to services used by their employees.

53.     Fully-insured employers and their employees pay premiums, co-payments, and deductibles in exchange for access to a health plan's provider network and also for insurance against the cost of care.  When the cost of healthcare services increases due to provider rate increases, health plans ultimately pass on some or all of the increases to their fully-insured customers.

54.    Although health plans usually pay for hospital services and physicians services provided to many patients, higher prices for those services are passed on to employers and other group purchasers of health plans.  Such costs are ultimately borne by patients who reside in the relevant geographic area through higher premiums, co-payments, deductibles and other out-of-pocket expenditures.

55.    The availability and number of alternative providers is the primary source of a health plan's bargaining power to negotiate competitive rates on behalf of its members.

56.    Residents of Richland, Lexington, Fairfield and Kershaw counties demand access to local hospitals and local orthopedic surgeons.  Health plans providing coverage to residents of Richland County need to include hospitals located in Richland County and orthopedic surgeons who provide services in Richland County in their network to offer a competitive product.  Health Plans providing coverage to residents of Richland, Lexington, Fairfield and Kershaw counties need to include hospitals located in that area and orthopedic surgeons who provide services in that area in their network to offer a competitive product.

57.    In the second stage of competition between providers, hospitals and physicians compete with other in-network providers to attract patients.  Health plans try to offer multiple in-network providers.  Providers in the same network must then compete to attract patients by offering better quality of care, patient satisfaction, and convenience.

58.    Prior to the Acquisition, health plans and self-insured employers seeking to contract with hospitals and orthopedists for the provision of inpatient orthopedic surgical services and orthopedic physician surgery services to their members and/or employees desiring service in Richland County could choose between Providence and Palmetto Health and among orthopedic surgeons based on price and non-price terms offered by the respective hospitals and

17

orthopedists in Richland County.  Similarly, prior to the Acquisition, health plans and self-insured employers seeking to contract with hospitals and orthopedists for the provision of inpatient orthopedic surgical services and orthopedic physician surgery services to their members and/or employees desiring services in Richland, Lexington, Fairfield & Kershaw counties could choose among the hospitals and orthopedic surgeons based on price and non-price terms offered by the respective hospitals and orthopedists in those  counties. Health plans, employers, and patients benefitted from this head-to-head competition with lower prices and improved quality and service.

**C.      Providence's Incorporation of the Moore Clinic Physicians into its orthopedic business line.**

59.      On July 1, 2007, Providence Hospital and the Moore Orthopaedic Clinic, P.A. ("Moore Orthopaedic Clinic") entered into a Comprehensive Services Agreement.  Pursuant to the Comprehensive Services Agreement, the Moore Orthopaedic Clinic provided Providence Hospital with (i) a medical director for orthopedic services, (ii) full-time call coverage in Providence Hospital's emergency departments by orthopedic physicians, and (iii) consulting services to Providence Hospital.

60.      During the duration of the Comprehensive Services Agreement, the orthopedic physicians who were then associated with the Moore Orthopaedic Clinic were employed by Moore Orthopaedic Clinic, and were not employed by Providence.

61.      On February 2, 2010, Providence Hospital and Providence Orthopaedic Group entered an Affiliation Agreement with the Moore Orthopaedic Clinic, P.A. under which Providence agreed to employ the physicians and support staff of the clinic and also to purchase the "Moore Orthopaedic Clinic" trade name and certain tangible assets associated with the clinic's orthopedic business.

62.     Beginning in June 2010, the Moore Orthopaedic Clinic physicians became employed physicians of Providence Orthopaedic Group, a limited liability company wholly owned and operated by Providence Hospital.  Providence consummated the purchase of the clinic's trade name and tangible assets.  Thereafter, Providence Orthopaedic Group did business as the Moore Center for Orthopedics.  The former Moore Orthopaedic Clinic was not otherwise organized or operated as a separate entity.  At times, the Providence Physicians continued to refer to themselves as the "Moore" physicians.

63.     Between June 2010 and April 2015, the following physicians entered Employment Agreements with Providence Orthopaedic Group: Bradley P. Presnal, M.D. ("Presnal"), Mark D. Locke, M.D. ("Locke"),  Kim J. Chillag, M.D., W. Bret Smith, M.D., Wendell Holmes, M.D., Jeffrey S. Hopkins, M.D., P. Douglas deHoll, M.D., Earl B. McFadden, M.D., Ryan M. Putnam, M.D., Christopher R. Hydorn, M.D., Michael P. Horan, M.D., William T. Felmly, M.D., Michael W. Peelle, M.D., W. Alaric Van Dam, M.D., John Clavet, M.D., Pranitha Nallu, M.D., Frank K. Noojin, M.D., Mickey F. Plymale, M.D., David A. Scott, M.D., David B. Fulton, M.D., and Mae Young, M.D., (collectively "Providence Physicians").

64.     Pursuant to their Employment Agreements, the Providence Physicians became employed full-time to provide professional, administrative, and supervisory services associated with the provision of orthopedic services on behalf of Providence.

65.     In addition, each Providence Physician who entered into the Employment Agreement with Providence agreed that:

> Physician shall use Physician's best efforts to actively and industriously pursue Physician's profession in the best interests of [Providence] and its patients.  Physician will carefully avoid any and all personal acts, habits and usages that might injure in any way, directly or indirectly, Physician's professional reputation or that of [Providence] or any employee of

[Providence], or which might otherwise be detrimental to any interest of [Providence].

66.    Each Providence Physician also agreed that:

Physician acknowledges that business information developed, acquired or retained by [Providence] is of substantial value and that its value may be destroyed by the disclosure thereof to anyone outside the employ of [Providence].  Accordingly, Physician hereby agrees that Physician will not, without the express written consent of a duly authorized officer of [Providence], disclose directly or indirectly any confidential information for the benefit of anyone other than [Providence].  The term "confidential information" as used herein means all information of  [Providence] of a business or technical nature, including but not limited to, the terms of this Agreement, patient and patient lists, financial information, billing and charge information, strategic information, physician relationship information, operational information, or any other information belonging to [Providence], whether or not created, developed, or improved upon by the Physician during Physician's employment hereunder.  The term "confidential information" shall also include all information of any type which directly or indirectly relates to peer review, utilization review, quality assurance and/or risk management activities.

67.    As of April 29, 2015, the Providence Orthopaedic Group included seventeen (17) orthopedic surgeons.  Mae Young, M.D. had executed an employment agreement and received a signing bonus but had not yet actually begun to work with the group.  Drs. Nallu, Van Damm and Clavet are not orthopedic surgeons but provided support for Providence's orthopedic service line by treating injuries of the musculoskeletal system.

**D.    Palmetto Health and Providence Discuss an Affiliation**

68.    Beginning in late 2013, Providence began exploring an affiliation with other hospital systems that could provide financial, clinical, and operational resources to Providence.

69.    In late 2013, Palmetto Health expressed an interest in a potential purchase of Providence, and Providence and Palmetto Health engaged in discussions about a potential sale of Providence to Palmetto Health.  Because it would have eliminated competition, any such purchase could have occurred only pursuant to federal and/or state approval and restrictions to

prevent or at least mitigate many of the adverse impacts of the elimination of competition between Palmetto Health and Providence. Palmetto Health had previously obtained a Certificate of Public Advantage in order be allowed to merge  Richland Memorial Hospital and Baptist Medical Center, which were competitors, into  Palmetto Health in 1997. Palmetto Health was interested in acquiring Providence primarily because it wanted to prevent new competition from entering the market because "there would be less need to compete within the community if a third party does not enter the marketplace" as one of the local physicians learned from Palmetto Health.

70.     In December of 2014, Palmetto Health executives met with Providence, stated that combining Palmetto Health and Providence would allow them to lower physician salaries by eliminating the competing employer and that, if Palmetto Health purchased Providence, Palmetto Health wished to close the Providence Downtown Hospital, a condition that made it highly unlikely that Providence would accept an offer from Palmetto Health.

71.     During these discussions in connection with a potential sale of Providence, Palmetto Health became aware of Providence's financial challenges.

72.     During its discussions with Providence, Palmetto Health also learned that Providence's orthopedic service line was the most profitable asset of Providence.

73.     Later  in 2014, Palmetto Health decided to abandon any effort to purchase Providence for fair market value and, instead, to pursue an illegal strategy for taking over Providence's most lucrative line of business as a way to protect and enhance Palmetto Health's monopoly power and eliminate or drastically reduce Providence's ability to compete with Palmetto Health .

E.     **Palmetto Health Approaches Providence Physicians While Engaging in Negotiations with Providence**

74.     Palmetto Health devised an illegal scheme intended to restrain competition and to protect, enhance and extend its monopoly power by clandestinely acquiring Providence's Moore Clinic orthopedic surgery business so that (a) Providence's ability to compete with Palmetto Health's monopoly would be severely weakened, (b) Providence would be much less attractive to competitors who might consider purchasing Providence as a way to enter the market Palmetto Health had monopolized, and (c) Palmetto Health's monopoly would be extended and enhanced to include inpatient orthopedic surgery and orthopedic physician services.

75.     Beginning in October 2014, at the same time Palmetto Health was in discussions with Providence about potentially acquiring Providence, Palmetto Health executives approached Providence Physicians and Providence executives about its plan to take Providence's orthopedic surgery line of business for itself.

76.     During these discussions, Palmetto Health, Presnal, Locke, and Hall agreed to pursue a common plan, conspiracy, and course of conduct to: (a) irreparably damage Providence's ability to compete with Palmetto Health; (b) prevent a third party competitor from entering the market, or, in any event, substantially diminish any potential competition from such a third party competitor; (c) eliminate competition and allow Palmetto Health to acquire monopoly power in the inpatient orthopedic surgery and orthopedic surgery physician services markets; and (d) benefit their own self-interests.

77.     In December 2014, Palmetto Health notified Providence that it was no longer interested in considering purchasing Providence but would consider other affiliation options.

78.     Presnal, Locke, and Hall later convinced Frick, Pace, Taylor, PPH and other Providence Physicians to join and pursue this common plan, conspiracy, and course of conduct.

22

79.     From October 2014 through April 2015, Palmetto Health communicated with Hall, Frick, Pace, Presnal, and Locke about Palmetto Health's acquisition of Providence's Moore Clinic orthopedic surgery business. This included acquisition of the practices of the Providence Physicians, the employment of Hall, Frick, Pace, and other Providence personnel, and acquisition of assets related to this business line including the potential acquisition of the Moore name. Palmetto Health met with Hall, Presnal, and Locke with the purpose of inducing Presnal and Locke to cause the Providence Physicians to breach their contracts with Providence.

80.     In October 2014, a physician who performs services for Providence informed Presnal about a rumor that Providence might announce the sale of Providence.

81.     Presnal responded by text message: "No way. No one would buy [Providence] without talking to us. Too easy [for the Providence Physicians] to leave. They would require a longer commitment from us. **Otherwise would [we c]ould torpedo the deal by announcing our 90 days**[.]"

82.     In early November 2014, Presnal met with Palmetto Health executives to discuss the Providence Physicians' departure from Providence and the acquisition of their practices by Palmetto Health.

83.     Presnal served as Providence's medical director and leader of its Moore Orthopedic Clinic and as a member of Providence's Operation Performance Executive Committee. ("the OPEC"). Providence relied on him to facilitate communications between Providence and the Providence Physicians and to promote Providence's interests. Presnal owed Providence fiduciary obligations of trust, loyalty, good faith, candor, and due care. Presnal breached his obligations by, among other things, leading, encouraging, assisting, and facilitating the departure of the Providence Physicians and their practices, including patients and staff, as

well as Providence's loss of related assets including the Moore name, and their acquisition by Providence's competitor, Palmetto Health.

84.    In November 2014, a physician texted Presnal:

"Apparently mike french [interim ceo of Providence] told the executive team sarcastically that some physicians thought that they could control the sell [sic] of the hospital if they were not involved.  So it sounds like he talks out of both sides of his mouth."

85.    Presnal responded: "Reality is that [the Providence Physicians] do control [the sale of Providence]."

86.    The physician later informed Presnal that Palmetto Health was "all in" to acquire the Providence Physicians because "[t]hey do not want anyone else in the market place and are willing to do whatever it takes."

87.    Presnal responded:  "Good now just need to convince [Providence Physicians]."

88.    The physician responded back to Presnal:  "I asked Ryan [Hall] to do the pros and cons and what moore [i.e. the Providence Physicians] needs for this to look like to make it work."

**F.    Providence Physicians and Providence Employees Engage in Conduct in Furtherance of the Conspiracy and in Violation of Their Fiduciary Obligations**

89.    As early as November 2014, Hall had knowledge that the Providence Physicians were contemplating leaving Providence.  Hall owed Providence fiduciary obligations of trust, loyalty, good faith, candor, and due care.  These duties obligated him to work in good faith to protect and enhance Providence's orthopedic surgery business line, retain the services of the Providence Physicians for Providence and promptly disseminate accurate and truthful information to Providence related to the potential departure of the Providence Physicians.  Instead, Hall worked covertly with Palmetto Health, concealed information from Providence and

encouraged, assisted, and facilitated the departure of the Providence Physicians and the acquisition of Providence's orthopedic line of business by Providence's competitor, Palmetto Health.

90.    On November 21, 2014, Hall and Locke met with John Singerling of Palmetto Health to discuss Palmetto Health's acquisition of the Providence Physicians.

91.    Locke and Hall owed Providence fiduciary obligations of trust, loyalty, good faith, candor, and due care. In violation of their duties of loyalty and good faith, Locke and Hall encouraged, assisted, and facilitated the departure of the Providence Physicians and Palmetto Health's take-over of Providence's orthopedic line of business.

92.    During the same time that Hall was meeting with Palmetto Health executives on behalf of the Providence Physicians to facilitate their departure from Providence and Palmetto Health's covert take-over of Providence's line of business, Hall was assuring Providence that he would work to grow Providence's orthopedic business line, assist with the sale of Providence and the transition of the Providence Physicians to the buyer who would operate Providence's hospitals in competition with Palmetto Health.

93.    On November 25, 2014, Hall sent a letter to Mike French ("French"), Interim CEO of Providence, stating as follows:

> Given the recent discussions with the Sisters of Charity Health System leadership regarding the strategic partnership or divestiture of Providence Hospitals, I feel my future with the organization is very strategic in the sale of the entity and transition to the buyer. . . .
>
> I am confident my relationship will ease the fears and uncertainty of change and deliver a valuable service to the Sisters of Charity Health System and the new buyer. My focus during this time of transition will remain on the growth of orthopedics and other key initiatives within my area of responsibility.

94.    Shortly after sending the letter to French, Hall prepared a "Pro's & Con's" list on behalf of the Providence Physicians and sent it to Taylor for advice:

Larry,

Given the physicians hold the 90 day trump card; I am doing my best to keep them informed on their options for WHEN or IF to play the card.  In an effort to be prepared for what I see as three options (wearing my practice admin hat) I am working on the following analysis (not in order):

Pro's & Con's

Option A: For Profit Hospital

Option B: Palmetto Health

Option C: Independent Practice

I have made headway on Palmetto Health and Independent Practice, but may need some help on the For Profit side (especially any insights on Tenet, etc. that may be beneficial).

If you have any ideas on another way to keep the guys focused on the facts vs. emotion that would be great . . . what I do not need is a fracturing of the group around this issue.  Strength in numbers at this point.

95.    Taylor agreed that he would assist Hall in preparing information on behalf of the Providence Physicians and in connection with the Providence Physicians' departure and acquisition by Palmetto Health.  Taylor and PPH owed Providence a duty to act in good faith to perform its obligations pursuant to the PPH Agreement.  Instead, Taylor and PPH acted in bad faith by assisting and facilitating the Providence Physicians' departure and acquisition by Palmetto Health.

96.    Hall, acting on behalf of the Providence Physicians, continued to facilitate discussions between Palmetto Health and the Providence Physicians.  At one point, Hall assured Presnal:

Perfect . . . it will all work out . . .  we are doing the right thing . . . the devil we know is better than the one we don't know[.]

Based upon information and belief, the "devil we know" referred to Palmetto Health and "the one we don't know" referred to a third party hospital system that might acquire or affiliate with Providence.

97.     On December 12, 2014, Hall informed Presnal:  "John Stover [a member of the Providence Board] called and is held to confidentiality but relayed all concerns . . . said we would be pleased with how it works out . . . no specifics . . . I say stick with plan as discussed yesterday."

98.     Presnal responded to Hall:  "I don't trust them. I say we proceed with our own interests. I am meeting with John [Singerling of Palmetto] this afternoon[.]"

99.     Hall responded back to Presnal:  "I agree completely . . . we are on the same page 100%."

100.     On December 15, 2014, Hall, acting on behalf of the Providence Physicians, contacted Navvis Healthways, a consulting group that had been engaged to provide services for Providence, seeking consulting and legal advice related to the Providence Physicians' departure from Providence and Palmetto Health's acquisition of Providence's orthopedic line of business. Navvis Healthways recommended to Hall that he contact local legal counsel for legal advice. Hall confirmed to Navvis Healthways that he would engage a local attorney.

101.     The following day, December 16, 2014, Frick engaged counsel for the Providence Physicians to advise them on their departure from Providence and their acquisition by Palmetto Health.  Frick also sent to counsel the confidential Providence Employment Agreements and other confidential Providence documents.

102.     Frick owed Providence fiduciary obligations of trust, loyalty, good faith, candor, and due care.  Frick breached his fiduciary obligations by, among other things, assisting and

facilitating the departure of the Providence Physicians and Palmetto Health's acquisition of their practices.

103.    On December 17, 2014, Hall advised Presnal that they had been "advised [apparently by counsel] to utilize home email addresses."

104.    Hall, Frick, and Presnal circulated their personal email addresses to each other and used personal email addresses to communicate with each other about their conspiratorial plans.  The Providence Physicians were later instructed to only use personal email accounts or text messages to communicate with each other about the Providence Physicians' departure and acquisition by Palmetto Health.  The Defendants communicated with each other and circulated information about the Providence Physicians' departure and Palmetto Health's acquisition of their practices through text messages, personal email accounts, Providence email accounts, Providence mobile phones, in-person meetings, telephone conversations, and a Dropbox account. In addition, the Defendants forwarded Providence's confidential and proprietary information to personal e-mail accounts and third parties and removed Providence's confidential and proprietary information from Providence's facilities.

105.    During this time period, Palmetto Health continued to meet with and communicate with the Former Providence Executive Defendants in furtherance of their common plan, conspiracy, and course of conduct.

106.    During this time period, Hall, Frick, Pace, Presnal, Locke, Taylor, and PPH were carrying out the Defendants' common plan, conspiracy, and course of conduct, which was all being orchestrated by Palmetto Health.

107.    Hall, Frick, and Pace, while they remained employed by Providence, continued to communicate with counsel on behalf of the Providence Physicians to facilitate their departure and acquisition by Palmetto Health.

108.    Pace also owed Providence fiduciary obligations of trust, loyalty, good faith, candor, and due care.  Pace breached his fiduciary obligations by, among other things, assisting and facilitating the departure of the Providence Physicians and Palmetto Health's acquisition of their practices.

109.    On January 21, 2015, Hall, Frick, Pace, Presnal, Locke, and other Providence Physicians met with counsel to discuss Providence Physicians' departure and Palmetto Health's acquisition of their practices.

110.    Frick arranged to meet with counsel and at least Presnal again on January 27, 2015 to continue discussing the Providence Physicians' departure and Palmetto Health's acquisition of their practices.

111.    In late January 2015, Hall prepared a list of "must haves" for Palmetto Health's acquisition of the Providence Physicians and their practices.  Hall sent this information to Presnal's "home email" address.

112.    On February 5, 2015, after learning that Palmetto Health had recently partnered with another hospital system, one of the Providence Physicians, Doug DeHoll wrote to Presnal: "Our chance to control a larger area just got better."  The Providence Physicians recognized that Palmetto Health could create a monopoly in the orthopedic service market following the acquisition of the Providence Physicians.

113.    In February 2015, Taylor prepared a document to assist in convincing the Providence Physicians to transfer their patients and practices from Providence to Palmetto Health.

114.    Hall emailed Taylor to confirm that he received the document prepared by Taylor, and then stated: "looks awesome!"

115.    Taylor responded that some areas of the document need to be "spiffed up" as Hall and he "think it through" together. Taylor, while still under contract to and paid by Providence, offered to assist Frick with facilitating the move, the Providence Physicians' departure, and Palmetto Health's acquisition of their practices. As the Acquisition was getting closer to being finalized with Palmetto Health, on February 18, 2015, Hall conveyed his gratitude to Presnal: "I appreciate what you are doing to lead us all."

116.    That same day, Presnal spoke with John Walsh, USC Professor of Clinical Orthopedic Surgery, about a potential partnership between USC and the Providence Physicians following Palmetto Health's acquisition of the practices of the Providence Physicians. Presnal advised Walsh to use his personal email address because "we have been advised [apparently by counsel] not to use work email."

117.    The following day, Presnal instructed Hall to "[h]ave Matt [Frick] set up [a] meeting with usc."

118.    On March 1, 2015, Hall informed Locke that he had "some big meetings about our future this week."

119.    Based upon information and belief, Hall met with Palmetto Health executives in March 2015 to discuss Palmetto Health's acquisition of the practices of the Providence

Physicians, his future employment with Palmetto Health, and the employment of Frick, Pace, and other Providence personnel.

120.    Prior to his meeting with Palmetto Health executives, Hall confirmed with Presnal that he was going to address "sports, structure, physician guarantee, and anesthesia" with Palmetto Health. Hall asked Presnal whether there was anything else that should be addressed with Palmetto Health.

121.    Presnal responded to Hall: "We must be in charge. Usc can have input but limited control. We must not be hampered anymore. We also need to talk with rob again about timing."

122.    That same day, Locke received a message from John Singerling at Palmetto Health, stating in part: "[L]et's finish our deal!"

123.    On March 5, 2015, Frick scheduled a meeting on March 9, 2015 with Hall, Frick, Pace, Presnal, Locke, and other Providence Physicians to discuss the Providence Physicians' departure and Palmetto Health's acquisition of their practices.

124.    Defendant Frick set up a Dropbox account to upload documents for the Providence Physicians to review.

125.    On March 6, 2015, Pace sent Hall and Frick an email with an attachment entitled "For Profit vs. Palmetto Grid" which compared the pros and cons of Palmetto Health acquiring the practices of the Providence Physicians with the pros and cons of the Providence Physicians remaining employed by Providence. Upon information and belief, this document was used to encourage and persuade the Providence Physicians to terminate their relationship with Providence and become employed by Palmetto Health.

G.    **Providence Physicians and Providence Employees Announce Their Resignation from Providence and Become Employed by Palmetto Health**

126.    By March 11, 2015, Hall was in possession of an Affiliation Agreement between the Providence Physicians and Palmetto Health.

127.    In March 2015, Dr. Earl McFadden ("McFadden") expressed his gratitude to Hall, Frick, and Pace for facilitating the Providence Physicians' departure and Palmetto Health's acquisition of their practices, stating in part: "I really appreciate all you've done for us."

128.    Hall responded to McFadden: "I appreciate your support and prayers. We are doing the right thing."

129.    Defendants continued to upload documents into the Dropbox account for the Providence Physicians to review.

130.    On March 27, 2015, Hall submitted his resignation to Providence effective April 24, 2015. The last day of his employment with Providence was April 24, 2015.

131.    Later on March 27, 2015, Hall informed McFadden: "I am looking forward to a bright future with Moore [referring to the Providence Physicians and their practices]."

132.    By early April, the Providence Physicians were close to finalizing the deal with Palmetto Health.

133.    On April 28, 2015, Presnal informed the Providence Physicians that he delivered the 90-day resignation notice on behalf of the Providence Physicians. Presnal stated:

> "I explained to [Terry Kessler] our rationale behind the decision to move to palmetto and join the university group (eventually)."

134.    By July 27, 2015, all but two of the Providence Physicians were no longer employed by Providence, and based upon information and belief, are currently employed by Palmetto Health.

135.    On June 19, 2015, Pace and Frick submitted their resignations to Providence. Based upon information and belief, Pace and Frick are employed by Palmetto Health.

### H.    LifePoint and Providence Negotiations and Agreement

136.    LifePoint is a company that provides healthcare services and is headquartered in Brentwood, Tennessee.

137.    Prior to the Providence Physicians' resignation from Providence, LifePoint offered to acquire Providence including its orthopedic line of business in return for a substantial purchase price.    LifePoint planned to maintain both of Providence's hospitals in Richland County.

138.    The Providence board of directors was prepared to approve a letter of intent to sell to LifePoint.

139.    The anticipated purchase price reflected Providence's competitive strength as a competitor to Palmetto Health's monopoly power, including Providence's Moore Clinic orthopedic service line based on the Providence Physicians and the investments Providence had made to enhance its competitive position through its orthopedic service line.

140.    On April 28, 2015, Presnal notified Providence that the Providence Physicians would terminate their employment with Providence in 90 days.    This notice gave the Providence Physicians the contractual right to purchase key assets associated with Providence's Moore Clinic line of business including the name.    The Providence Physicians exercised that right in order to make those assets available to Palmetto Health as part of the Acquisition.

141.    The news that the Providence Physicians had given notice of their intent to terminate their relationship with Providence in order to join Palmetto Health negatively and significantly impacted Providence's negotiating position with LifePoint.

142.    Palmetto Health had taken from Providence the competitive strength provided by its Moore Clinic line of business.  The competitive strength provided to Providence by its Moore Clinic was gone.  The loss of that competitive strength immediately damaged Providence in its business and property.

143.    As a result of the success of Defendants' scheme for Palmetto Health to take for itself Providence's Moore Clinic orthopedic line of business, the sale that had been about to occur was no longer possible.  Providence was no longer able to offer potential buyers a deal that included the competitive strength provided by that line of business.  Providence was no longer able to offer residents of the relevant market the benefits of the competition generated as a result of the strength Providence gained through its Moore Clinic orthopedic line of business.

144.    Defendants were so certain that their conspiracy to monopolize would succeed and would damage Providence so substantially that it would force a transfer of Providence to Palmetto, that Defendants enticed Providence Physicians and Providence's Moore Clinic employees to leave Providence to join Palmetto Health by telling them, that, even though they would become employees of Palmetto Health, they would be able to continue to work in the same Providence locations as before the Acquisition, except that they would be employees of Palmetto Health.

145.    The loss of the competitive strength provided by the Moore Clinic line of business threatened Providence's survival and forced Providence to become concerned that bankruptcy was a real threat and to begin to explore that option.

146.    Providence was then forced to attempt to negotiate an entirely different sale, a sale of its assets without the competitive strength that had been eliminated by Palmetto Health.

147.    In July 2105, after a series of negotiations, LifePoint ultimately agreed to acquire Providence for a substantially lower amount, without the line of business that had been taken by Palmetto Health, and the transaction was consummated on February 1, 2016.

148.    The damage to Providence's ability to compete resulting from Defendants' wrongful acts is at least $50 million.

## VI.    POST-ACQUISITION IMPACT ON ORTHOPEDIC SERVICES

149.    Upon information and belief, the Providence Physicians executed a "Term Sheet Related to an Orthopedic Affiliation with Palmetto Health" on or before April 28, 2015.

150.    On April 28, 2015, the Providence Physicians submitted their resignations to Providence.

151.    Dr. deHoll and Dr. Nallu, however, were not free to leave Providence at that time due to their contractual obligations to Providence and continued to be employed by Providence through January 2016.  Although he continued to be employed by Providence through January 2016, Dr. deHoll worked, during that time, to transfer as much of his work as possible to Palmetto Health and to promote the practice that Palmetto Health had wrongfully acquired from Providence.

152.    After obtaining control of the Providence Physicians and their practices, Palmetto Health has merged those practices with the practices of the USC Physicians to be part of a single group, the Palmetto Health USC Medical Group.

153.    Prior to the Acquisition, competition among orthopedic surgeons, including the Providence Physicians, in Richland County was robust.  The Acquisition substantially eliminated

this competition by combining 31 orthopedic surgeons into one unit aligned with Palmetto Health for the purpose of negotiating with health plans, leaving only 14 orthopedic surgeons in five different practices as competitors and alternatives for health plans desiring orthopedic surgeons practicing in Richland County. Following the Acquisition, Palmetto Health now directly or indirectly controls almost 70% of the orthopedic surgeons practicing in Richland County.

154.     As a result of the Acquisition, Palmetto Health has become the dominant provider of inpatient orthopedic surgical services and orthopedic surgeon physician services to residents of Richland County as well as residents of Richland, Lexington, Fairfield and Kershaw counties with a market share in Richland County close to 70% and a market share in Richland, Lexington, Fairfield and Kershaw counties of over 60%. Through the Acquisition, Palmetto Health has diminished the significant competitive constraints exerted by Providence in the relevant markets.

155.     The Acquisition eliminated price and non-price competition among orthopedic surgeons and created a dominant orthopedic surgery practice at Palmetto Health.

156.     The Acquisition increased Palmetto Health's dominance in the already highly concentrated acute care inpatient hospital services market.

157.     The Acquisition enhances and protects Palmetto Health's monopoly power over general acute inpatient hospital services to residents of the relevant geographic market and, further, gives Palmetto Health monopoly power in the market for inpatient orthopedic surgery and orthopedic physician surgery services provided to residents of the relevant geographic market covered by commercial health plans in the following ways:

(a)     Maintaining, increasing, and protecting the ability of Palmetto Health to unilaterally raise prices for acute inpatient hospital services;

(b)      Increasing the ability of Palmetto Health to unilaterally raise prices for inpatient orthopedic surgery and orthopedic surgery physician services;

(c)      Substantially reducing the competition faced by Palmetto Health within Richland County regarding the provision of acute inpatient hospital services;

(d)      Eliminating actual, direct, and substantial competition between the orthopedic surgeons practicing in the relevant market; and

(e)      Reducing incentives for Palmetto Health to maintain or improve service and quality in the relevant markets.

158.    As a result of the Acquisition, Palmetto Health will be able to exercise unilateral market power to raise prices for inpatient orthopedic surgery services and orthopedic surgery physician services.  It will also have enhanced power to raise prices for general acute care inpatient hospital services.  When Palmetto Health chooses to exercise this power, most health plans covering residents of the relevant market will pay prices for orthopedic services and hospital services that are significantly higher than prices they would have paid absent the Acquisition.

159.    Although health plans usually pay for the bulk of  orthopedic surgery, orthopedic surgery physician services, and general inpatient acute care provided to many patients, higher prices for those services are passed on to patients, employers and other group purchasers of health insurance plans.  Such costs are ultimately borne by patients residing in the relevant market through higher premiums, co-payments, and other out-of-pocket expenditures.

160.    As a result of the Acquisition, residents of the relevant market, and their employers will pay directly or indirectly through higher premiums, co-payments, and other out-of-pocket costs when Palmetto Health chooses to exercise its enhanced market power, as

commercial health plans will be forced to accede to Palmetto Health's increased rate and preference demands for orthopedic surgery and acute inpatient hospital services in general.

161.   New market entry into the relevant geographic market will not be sufficient to deter, prevent, or counter the anticompetitive effects of the Acquisition.

162.   There are substantial barriers to entry in the market for inpatient acute care hospital services in the relevant geographic market due to the substantial costs and delay involved in adding hospital beds as well as South Carolina's certificate of need requirements.  It would be extremely difficult, if not impossible, for any entity not already providing these services in the relevant market to enter the market except by acquiring an existing hospital.  The competition eliminated by the Acquisition will not be replaced by new hospitals.

163.   There are also substantial barriers to entry in the market for inpatient orthopedic physician services and orthopedic surgery physician services. One significant barrier to entry in the relevant markets for inpatient orthopedic physician services and orthopedic surgery physician services is the need for new entrants to recruit a sufficient number of orthopedists with appropriate training, experience, and areas of specialization.  The time required, cost, and difficulty of recruiting orthopedic surgeons into the relevant geographic market in light of the existing market power of Palmetto Health and structure of the market is so great that the competition eliminated by the Acquisition will not be replaced by a sufficient number of additional orthopedic surgeons quickly enough to counteract the exercise of Palmetto Health's enhanced and newly gained monopoly power.  Palmetto Health's strengthened position in the market further elevates the already high barriers to entry that existed in this market.

164.   Palmetto Health's anticompetitive conduct will impede the ability of residents of the relevant market to benefit from competition for the highest quality orthopedic surgery

services, orthopedic surgery physician services, and acute inpatient hospital services at the best price.

165.    Documents generated before the Acquisition reveal that Providence Physicians anticipated that the transaction would increase their control of the market for orthopedic services and that the Defendants were aware of this.  Former Providence executives' and Providence Physicians' documents confirm that the Acquisition likely will lead to higher healthcare costs and the loss of valuable non-price competition.

166.    For example, after Palmetto Health announced its partnership with another hospital system, the former Providence Physicians recognized that their "chances to control a larger area just got better" once they joined Palmetto Health.

167.    Presnal was informed that partnering with Palmetto Health would potentially provide Palmetto Health and the former Providence Physicians with "increased contracted reimbursement rates [with health plans] with increased market share."  And, on information and belief, the rates for the services of the Providence Physicians increased immediately on their employment with Palmetto Health.

## VII.    DUTIES OF THE INDIVIDUAL DEFENDANTS AND PPH

168.    By reasons of their positions as officers, executives, and/or fiduciaries of Providence and because of their ability to control the business and financial affairs of Providence and access to Providence's confidential information and trade secrets, Hall, Frick, and Pace owed Providence fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage the affairs of Providence in a fair, just, honest, and equitable manner.  Hall, Frick, and Pace were required to act in furtherance of the best interests of Providence and not in furtherance of their personal interests or benefits.

169.    Because of their advisory, executive and managerial positions with Providence, Hall, Frick, and Pace owed Providence a fiduciary duty to exercise reasonable and prudent supervision over the management, policies, practices, and control of Providence.

170.    Hall, Frick, and Pace owed Providence the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Providence and in the use and preservation of its property and assets.

171.    Hall, Frick, and Pace owed Providence a fiduciary duty to exercise good faith to ensure that Providence employees operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations.

172.    Furthermore, they owed Providence a fiduciary duty to work to ensure that Providence and its patients continued to receive and enjoy the benefits of the services of the Providence Physicians and to maintain, promote, and enhance the relationship between Providence and the Providence Physicians.

173.    Hall, Frick, and Pace owed Providence a fiduciary duty to exercise good faith in taking appropriate actions to correct misconduct and to implement and maintain adequate controls to ensure that any expenditures related to the Moore Clinic line of business were legitimate and in the best interests of Providence.

174.    Hall, Frick, and Pace owed Providence a fiduciary duty to avoid wasting Providence's assets.

175.    Hall, Frick, and Pace owed Providence a fiduciary duty to promptly disseminate accurate and truthful information to Providence.

176.    Hall, Frick, and Pace also owed Providence a common law fiduciary duty of loyalty and good faith.  As employees of Providence, Hall, Frick, and Pace were obligated to render loyal, diligent, and faithful service to Providence.

177.    Hall, Frick, and Pace were required to act solely for the benefit of Providence in matters within the scope of their employment, and during the entire duration of their employment, and were not permitted to engage in conduct adverse to Providence's interest.

178.    Hall, Frick, and Pace were required not to act or to agree to act during the period of their employment for persons or entities whose interests conflicted with Providence.

179.    Hall, Frick, and Pace were required not to use Providence's time or resources in order to locate or procure replacement employment for themselves, or other Providence employees.

180.    Hall, Frick, and Pace were required not to utilize Providence's proprietary information to prepare to compete as a competitor of Providence, or to share such information with third parties including Providence's competitors.

181.    Taylor and PPH owed Providence a duty to act in good faith to perform PPH's obligations pursuant to the PPH Agreement.  Taylor and PPH were required to not neglect or refuse to fulfill their duties or contractual obligations to Providence and not to act in bad faith in causing injury or damage to Providence.

182.    Taylor and PPH owed Providence a duty to act in a manner consistent with good business practices in South Carolina.

## VIII.   BREACHES OF DUTIES

183.    Hall, Frick, Pace, and Presnal, because of their advisory, executive, and managerial positions with Providence, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, which resulted in substantial harm to Providence.

184.    Hall, Frick, Pace, and Presnal breached their fiduciary duties by engaging in actions, omissions, and/or misconduct, which include multiple instances of self-dealing, engaging in conflicts of interest, nondisclosure of material facts and transactions, and otherwise acting in furtherance of their own personal interests and in complete disregard for Providence's best interests.

185.    Hall, Frick, Pace, Presnal, and Locke breached their common law duty of loyalty and good faith by engaging in actions, omissions, and/or misconduct, which include multiple instances of self-dealing, engaging in conflicts of interest, nondisclosure of material facts and transactions, and otherwise acting in furtherance of their own personal interests and in complete disregard for Providence's best interests.

186.    Hall, Frick, Pace, Presnal, and Locke breached their fiduciary obligations of trust, loyalty, good faith, candor, and due care by engaging in the following conduct:

(a)    deceiving Providence, concealing material information from Providence, making untrue statements or omissions, and engaging in concealing deceitful business practices;

(b)    failing to dedicate themselves to working to retain for Providence and its patients the services of the Providence Physicians and their assistants;

(c)    failing to protect Providence's assets and property;

(d)    in the case of Presnal, Hall, Frick, and Pace, rejecting proposals for financial controls that would have prevented the expenditure of approximately $2.8 million of Providence's funds to be spent in payment of fraudulent invoices to a company named Creative Casting;

(e)    in the case of Hall, Frick, and Pace allowing approximately $2.8 million of Providence funds to be spent in payment of fraudulent invoices from Creative Casting;

(f)    accessing, obtaining, disclosing, and misappropriating Providence's proprietary and confidential business information;

(g)    devoting time, effort, and resources to a business which competes with Providence while employed by Providence on a full-time basis;

(h)    diverting Providence's equipment and resources to their own benefit and use while employed by Providence on a full-time basis;

(i)    conspiring with Defendants to solicit Providence employees to terminate their relationship with Providence and join Palmetto Health;

(j)    soliciting Providence's vendors to perform the same or similar services in direct competition with Providence;

(k)    interfering with existing contractual relations between Providence and the Providence Physicians;

(l)    interfering with prospective contractual relations between Providence and the Providence Physicians;

(m)    interfering with Providence's prospective contract with LifePoint;

(n)    aiding and abetting Providence employees engaging in disloyal, bad faith, deceitful, fraudulent, imprudent, unreasonable, and/or wrongful business practices that were contrary to Providence's interests, policies, practices, and procedures;

(o)    violating federal and state laws, rules, regulations, requirements, and contractual obligations; and

43

(p)    failing to prevent and/or assisting others in violating federal and state laws, rules, regulations, requirements, and contractual obligations.

187.    These actions were not a good faith exercise of business judgment to protect and promote Providence's legitimate interests.

188.    The conduct of Presnal, Hall, Frick, and Pace complained of herein involves knowing and culpable violations of their obligations as officers, executives, fiduciaries, and/or employees, the absence of good faith on their part, and a reckless disregard for their duties to Providence, which Presnal, Hall, Frick, and Pace were aware or should have been aware posed a serious risk of injury to Providence.

189.    Taylor and PPH breached their duties to act in good faith in performing their obligations to Providence in a manner consistent with good business practices in South Carolina by conspiring with Defendants to assist with soliciting Providence employees to terminate their relationship with Providence and join Palmetto Health.

190.    Taylor and PPH breached their duties to act in good faith in performing their obligations to Providence in a manner consistent with good business practices in South Carolina by aiding and abetting Providence employees engaging in disloyal, bad faith, deceitful, fraudulent, imprudent, unreasonable, and/or wrongful business practices that were contrary to Providence's interests, policies, practices, and procedures.

## IX.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

191.    During all times relevant hereto, the Defendants, as well as Presnal and Locke, collectively and individually initiated a course of conduct that was designed to cause injury to Providence and benefit the Defendants. In committing the wrongful acts and violations of law detailed herein, Defendants have pursued or joined in the pursuit of a common plan, conspiracy,

and course of conduct, and have acted in concert with one another in furtherance of their conspiracy.

192.    The purpose and effect of the Defendants' common plan, conspiracy, and course of conduct was, among other things, to: (a) irreparably cause injury to Providence and its ability to compete with Palmetto Health; (b) prevent a third party competitor from entering the market or, failing that, to weaken any potential competition from such a third party competitor; (c) maintain and enhance Palmetto Health's monopoly power in the acute inpatient hospital services market; (d) eliminate competition and acquire monopoly power for Palmetto Health and the Providence Physicians in the inpatient orthopedic surgery services and orthopedic surgery physician services markets; and (e) benefit their own self-interests.

193.    Each of the Defendants was a direct, necessary, and substantial participant in the conspiracy. Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Defendant acted with knowledge of their primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of Defendants' overall contribution to and furtherance of the wrongdoing.

194.    The Defendants accomplished their common plan, conspiracy, and common course of conduct by engaging in the wrongful conduct particularized herein, including but not limited to:

(a)    breaching fiduciary duties and violating legal obligations owed to Providence;

(b)    aiding or abetting and/or assisting other Defendants in breaching fiduciary duties and violating legal obligations owed to Providence;

(c)     engaging in disloyal, bad faith, deceitful, fraudulent, imprudent, unreasonable, and/or wrongful business practices that were contrary to Providence's interests, policies, practices, and procedures;

(d)     aiding and abetting and/or assisting Individual Defendants in engaging in disloyal, bad faith, deceitful, fraudulent, imprudent, unreasonable, and/or wrongful business practices that were contrary to Providence's interests, policies, practices, and procedures;

(e)     interfering with existing and prospective contractual relations between Providence and the Providence Physicians;

(f)     aiding and abetting and/or assisting other Defendants in interfering with existing and prospective contractual relations between Providence and the Providence Physicians;

(g)     interfering with Providence's prospective contract with LifePoint;

(h)     aiding and abetting and/or assisting Defendants in interfering with Providence's prospective contract with LifePoint;

(i)     participating in, causing, failing to correct, and/or failing to take action to remedy harms inflicted upon Providence;

(j)     aiding and abetting and/or assisting other Defendants in the failure to protect Providence's assets and property;

(k)     misappropriating Providence's proprietary and confidential business information; and

(l)     aiding and abetting and/or assisting other Defendants in misappropriating Providence's proprietary and confidential business information.

## X.    DAMAGES TO PROVIDENCE

195.    Defendants' aforementioned actions, omissions, and/or misconduct harmed Providence's ability to compete and were directly adverse to and contrary to Providence's interests, policies, practices, and procedures.

196.    Providence has been severely damaged and irreparably injured by Defendants' wrongful conduct.  As a direct and proximate result of the Defendants' actions as alleged above, Providence has been substantially damaged, losing in excess of $50 million dollars in value as a result of the conduct described herein.

197.    The Acquisition has irreparably harmed Providence because (1) the loss of the ability to compete reduced the value of Providence's hospital operations by  more than $50 million; (2) Providence's orthopedic service revenues have declined by more than 76% since the announced resignation and departure of the former Providence Physicians; and (3) Palmetto Health has a greater ability to obtain preferential treatment from payors and employers and disrupt Providence's provider networks offered to managed care and employers.

198.    Palmetto Health will continue its practice of foreclosing virtually all competition for the hospital admissions of the physician practices it acquires.

## CLAIMS FOR RELIEF

### COUNT 1 - VIOLATION OF § 1 OF SHERMAN ACT 15 U.S.C.  1

#### (Against All Defendants)

199.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 198 of this Complaint.

200.    The Acquisition was effectuated by contracts, combinations, and conspiracies that are unlawful under Section 1 of the Sherman Act (15 U.S.C. § 1).

201.    The Acquisition has and will continue to cause substantial anticompetitive effects as described above.

202.    This Acquisition has and will continue to unreasonably restrain trade in violation of Section 1 of the Sherman Act.

203.    Providence has been damaged in its business by Defendants' violations of Section 1 of the Sherman Act.

## COUNT 2 - CONSPIRACY TO MONOPOLIZE HOSPITAL SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15 U.S.C. 2

### (Against All Defendants)

204.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 203 of this Complaint.

205.    Palmetto Health has monopoly power over inpatient acute care hospital services provided to residents of the relevant market because (a) it controls three of five facilities providing inpatient services in Richland County and over 75% of the acute care hospital beds in Richland County and over 51 % of the acute care hospital beds in Richland, Lexington, Fairfield, and Kershaw counties, (b) has a market share of approximately  65% of inpatient acute care hospital services provided to residents of Richland County and in excess of 51% for residents of Richland, Lexington, Fairfield, and Kershaw counties, (c) is the sole provider in Richland County of inpatient acute care hospital services such as  obstetrics, and pediatrics, (d) is the sole provide in Richland, Lexington, Fairfield, and Kershaw counties of Level III neonatal intensive care, regional perinatal care, and Level III trauma service, (e) is the largest health system in the Midlands region of South Carolina, (f) maintains high occupancy levels at its flagship facilities, and (g) receives in excess of $1 billion each year in revenues.

206.    As a result of its monopoly power in this market, Palmetto Health is able to control price as well as non-price competition and exclude competition in the market due to the fact that commercial health plans must include Palmetto Health in their networks for insureds living in the relevant market.

207.    Palmetto Health, the other Defendants, Presnal and Locke conspired to cause the Acquisition to occur with the specific intent of extending and enhancing Palmetto Health's monopoly in hospital services by preventing the acquisition of Providence by any entity other than Palmetto Health or, in the alternative, by significantly reducing the ability of any purchaser of Providence to compete with Palmetto Health.

208.    In furtherance of their conspiracy, Defendants committed the acts alleged above.

209.    The conduct of Palmetto Health and the other Defendants is unlawful under Section 2 of the Sherman Act, 15 U.S.C. 2.

210.    This unlawful conspiracy to monopolize has damaged Providence in its business and property by damaging its ability to compete.

### COUNT 3 - MONOPOLIZATION OF HOSPITAL SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15 U.S.C. 2

#### (Against Palmetto Health )

211.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 210 of this Complaint.

212.    Palmetto Health completed the Acquisition and willfully engaged in the other conduct alleged in order to enhance and maintain its monopoly power in the market for inpatient acute care hospital services provided to residents of the relevant market.

213.    As a result of the Acquisition and the other conduct alleged, Palmetto Health has enhanced and maintained its monopoly power in the market for inpatient acute care hospital

services to residents of the relevant market, extended its monopoly power to orthopedic surgery and, at the same time, significantly impaired the ability of Providence to compete with Palmetto Health.

214.    The conduct of Palmetto Health and the other Defendants was exclusionary, predatory, and anticompetitive and is unlawful under Section 2 of the Sherman Act, 15 U.S.C. 2.

215.    This unlawful monopolization has damaged Providence in its business and property.

## COUNT 4 - ATTEMPTED MONOPOLIZATION OF HOSPITAL SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15 U.S.C. 2

### (Against Palmetto Health)

216.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 215 of this Complaint.

217.    Palmetto Health engaged in the anticompetitive conduct alleged above.

218.    Palmetto Health did this with the specific intent to monopolize the market for inpatient acute care hospital services.

219.    In the event that Palmetto Health did not achieve a monopoly as alleged above, it created a dangerous probability that it would achieve monopoly power in the market for inpatient acute care hospital services provided to residents of the relevant market covered by commercial health plans.

220.    The conduct of Palmetto Health is unlawful under Section 2 of the Sherman Act, 15 U.S.C. 2 and has damaged Providence in its business and property.

## COUNT 5 - CONSPIRACY TO MONOPOLIZE INPATIENT ORTHOPEDIC SURGERY SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15 U.S.C. 2

### (Against All Defendants)

221.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 220 of this Complaint.

222.    Palmetto Health and the other Defendants conspired to cause the Acquisition to occur with the specific intent of giving Palmetto Health monopoly power in the provision of inpatient orthopedic surgery.

223.    In furtherance of their conspiracy, Defendants committed the acts alleged above.

224.    The conduct of Palmetto Health and the other Defendants is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2.

225.    This unlawful conspiracy to monopolize has damaged Providence in its business and property.

## COUNT 6 - MONOPOLIZATION OF INPATIENT ORTHOPEDIC SURGERY SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15 U.S.C. 2

### (Against Palmetto Health)

226.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 225 of this Complaint.

227.    As a result of the Acquisition and the other conduct alleged, Palmetto Health increased its market share of inpatient orthopedic surgery services provided to residents of Richland County covered by commercial health plans during the last calendar quarter of 2015 to approximately 67% and to almost 60% for residents of Richland, Lexington, Fairfield, and Kershaw counties combined.    Palmetto Health's control over the provision of inpatient orthopedic surgery services in the relevant market has given Palmetto Health ability to control

price as well as non-price competition and exclude competition in that market due to the fact that commercial health plans must include Palmetto Health in their networks for insureds living in that market and, thus, those health plans have minimal ability to negotiate lower prices with Palmetto Health for these services.

228.    By accomplishing the Acquisition and engaging in the other conduct alleged, Palmetto Health acquired monopoly power over the provision of those services in the relevant geographic market.

229.    The conduct of Palmetto Health and the other Defendants is unlawful under Section 2 of the Sherman Act, 15 U.S.C.  2.

230.    This unlawful monopolization has damaged Providence in its business and property.

## COUNT 7 - ATTEMPTED MONOPOLIZATION OF INPATIENT ORTHOPEDIC SURGERY SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15 U.S.C. 2

### (Against Palmetto Health)

231.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 230 of this Complaint.

232.    Palmetto Health engaged in the anticompetitive conduct alleged above.

233.    Palmetto Health did this with the specific intent to monopolize and gain monopoly power in the market for inpatient orthopedic surgery.

234.    In the event that Palmetto Health did not achieve a monopoly as alleged above, it created a dangerous probability of achieving monopoly power in the market for inpatient orthopedic surgery provided to residents of the relevant market covered by commercial health plans.

235.    The conduct of Palmetto Health is unlawful under Section 2 of the Sherman Act, 15 U.S.C.  2.

236.    This attempt to gain monopoly power has damaged Providence in its business and property.

## COUNT 8 - CONSPIRACY TO MONOPOLIZE ORTHOPEDIC SURGERY PHYSICIAN SERVICES IN VIOLATION OF  § 2 SHERMAN ACT, 15 U.S.C. 2

### (Against All Defendants)

237.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 236 of this Complaint.

238.    Palmetto Health and the other Defendants conspired to cause the Acquisition to occur with the specific intent of giving Palmetto Health monopoly power in the provision of orthopedic surgery physician services.

239.    In furtherance of their conspiracy, Defendants committed the acts alleged above.

240.    The conduct of Palmetto Health and the other Defendants is unlawful under Section 2 of the Sherman Act, 15 U.S.C.  2.

241.    This unlawful conspiracy to monopolize has damaged Providence in its business and property.

## COUNT 9 - MONOPOLIZATION OF ORTHOPEDIC SURGERY PHYSICIAN SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15 U.S.C. 2

### (Against Palmetto Health)

242.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 241 of this Complaint.

243.    As a result of the Acquisition, Palmetto Health obtained almost 70% of the orthopedic surgeons providing orthopedic surgery in Richland County as well as their practices,

patient relationships and support staff and now has, on information and belief, at least 70% of this market. Palmetto Health has also obtained control over almost 60% of the orthopedic surgeons providing orthopedic surgery in Richland, Lexington, Fairfield, and Kershaw counties combined, as well as their practices, patient relationships and support staff and now has, on information and belief, at least 60% of this market.

244.    Palmetto Health's control over these orthopedic surgeons, their practices and their patient relationships and support staff has given Palmetto Health the ability to control price as well as non-price competition and exclude competition in the market for orthopedic surgery physician services to residents of the relevant geographic market due to the fact that commercial health plans must include Palmetto Health's orthopedic surgeons in their networks for insureds living in that market and, thus, have minimal ability to negotiate lower prices with Palmetto Health for these services.

245.    In addition, as a result of the Acquisition and the other conduct alleged, Palmetto Health significantly impaired the ability of Providence, to compete with Palmetto Health in providing orthopedic surgery physician services to residents of the relevant geographic market.

246.    Thus, Palmetto Health has obtained monopoly power over the provision of orthopedic physician surgery services to residents of the relevant geographic market covered by commercial health plans.

247.    The conduct of Palmetto Health and the other Defendants is unlawful under Section 2 of the Sherman Act, 15 U.S.C. 2.

248.    This unlawful monopolization has damaged Providence in its business and property.

**COUNT 10 - ATTEMPTED MONOPOLIZATION OF ORTHOPEDIC SURGERY PHYSICIAN SERVICES IN VIOLATION OF § 2 OF SHERMAN ACT, 15 U.S.C.  2**

**(Against Palmetto Health)**

249.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 248 of this Complaint.

250.    Palmetto Health engaged in the anticompetitive conduct alleged above.

251.    Palmetto Health did this with the specific intent to monopolize and gain monopoly power in the market for orthopedic surgery physician services.

252.    In the event that Palmetto Health did not achieve a monopoly as alleged above, it created a dangerous probability that it would achieve monopoly power in the market for orthopedic surgery physician services provided to residents of the relevant market.

253.    The conduct of Palmetto Health is unlawful under Section 2 of the Sherman Act, 15 U.S.C.  2.

254.    This attempt to gain monopoly power has damaged Providence in its business and property.

**COUNT 11 - VIOLATION OF § 7 OF THE CLAYTON ACT, AS AMENDED, 15 U.S.C. 18**

**(Against Palmetto Health)**

255.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 254 of this Complaint.

256.    Under § 7 of the Clayton Act, Providence need only demonstrate by a preponderance of the evidence that the Acquisition's effect "may be substantially to lessen competition, or to tend to create a monopoly"  "in any line of commerce in any section of the country" to establish that the Acquisition violated the Act.  Congress chose the words "*may be*"

because the Act was designed to prohibit and "arrest restraints of trade in their incipiency and before they develop into full-fledged restraints." *Brown Shoe Co. v United States,* 370 U.S. 294, 323 & n. 39 (1962).

257.    The Acquisition will likely lessen competition in the relevant markets in violation of § 7 of the Clayton Act, as amended, 15 U.S.C.  18.

258.    The Acquisition violated § 7 of the Clayton Act.

259.    The Acquisition has damaged Providence in its business and property.

## COUNT 12 - VIOLATION OF SOUTH CAROLINA
## UNFAIR TRADE PRACTICES ACT

### (Against All Defendants)

260.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 259 of this Complaint.

261.    Palmetto Health's monopolization and attempt to monopolize, as alleged above, as well as the conspiracies to monopolize and other wrongful acts alleged above by Palmetto Health and the other Defendants occurred in the course of Palmetto Health's competition with Providence in the provision of healthcare services in the relevant product markets and are collectively and individually unfair methods of competition as well as deceptive acts and practices that violate South Carolina's Unfair Trade Practices Act, South Carolina Code § 39-5-20.

262.    This unfair competition and these unfair and deceptive acts and practices impact the public interest because (a) they have, as alleged above, extended and created monopoly power for Palmetto Health, or at least created a dangerous probability of extending and creating monopoly power for Palmetto Health, in the markets for inpatient acute care hospital services,

inpatient orthopedic surgery, and orthopedic surgery physician services and (b) they are capable of repetition.

263.    Defendants acted intentionally in committing these acts and practices.

264.    This unfair competition and unfair acts and practices have damaged Providence.

## COUNT 13 - BREACH OF FIDUCIARY DUTY TO PROTECT PROVIDENCE'S INTERESTS

### (Against Defendants Hall, Frick, and Pace)

265.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 264 of this Complaint.

266.    Because of their advisory, executive, managerial, and leadership positions with Providence, Hall, Frick, and Pace owed a fiduciary duty to Providence and were bound to act in good faith and with due regard to the interests of Providence.

267.    Pursuant to their fiduciary duties, Hall, Frick, and Pace were required to disclose significant and material information to Providence.

268.    By soliciting Providence's employees and the Providence Physicians, while employed by Providence on a full-time basis, to leave the employ of Providence and work for a competing hospital system, Hall, Frick, and Pace breached their fiduciary duties owed to Providence.

269.    By secretly accessing, obtaining, disclosing, and misappropriating Providence's proprietary and confidential business, Hall, Frick, and Pace breached their fiduciary duties owed to Providence.

270.    By secretly devoting time, effort, and resources to a business which competes with Providence, Palmetto Health, while employed by Providence on a full-time basis, Hall, Frick, and Pace, breached their fiduciary duties owed to Providence.

271.    By secretly diverting Providence's equipment and resources to their own benefit and use while employed by Providence on a full-time basis, Hall, Frick, and Pace breached their fiduciary duties owed to Providence.

272.    By secretly soliciting Providence's vendors, while employed by Providence on a full-time basis, to perform the same or similar services in direct competition with Providence, Hall, Frick, and Pace breached their fiduciary duties owed to Providence.

273.    By rejecting proposals for financial controls that would have prevented the expenditure of approximately $2.8 million of Providence's funds in payment of fraudulent invoices to a company named Creative Casting and allowing approximately $2.8 million of Providence's funds to be spent in payment of fraudulent invoices from Creative Casting Hall, Frick, and Pace breached their fiduciary duties owed to Providence.

274.    Hall, Frick, and Pace have intentionally and systematically breached their fiduciary duties to Providence.

275.    These breaches have damaged Providence.

## COUNT 14 - AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

276.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 275 of this Complaint, except paragraph 273.

277.    At all relevant times, the Defendants knew that Hall, Frick, Pace, Presnal and Locke owed fiduciary duties to Providence.

278.    The Defendants were fully aware of the harm that would be incurred by Providence as a result of their wrongful and deceitful actions, and the Defendants knowingly

acted in a self-serving manner by encouraging, allowing and directing Hall, Frick, Pace, Presnal and Locke to disregard their fiduciary duties to Providence and assisting them in that regard.

279.    Upon information and belief, the Defendants negligently, wantonly, heedlessly, wrongfully, recklessly, improperly, intentionally, and/or illegally aided and abetted Hall, Frick, Pace, Presnal and Locke in breaching their fiduciary duties to Providence by expressly or impliedly directing Hall, Frick, Pace, Presnal and Locke to, among other things:

(a)    Meet with and pursue business opportunities with Palmetto Health on behalf of the Providence Physicians;

(b)    assist with developing a strategy to convince the Providence Physicians and 330 Providence employees to leave Providence and join Palmetto Health;

(c)    solicit and/or induce Providence Physicians and 330 Providence employees to leave their employment with Providence to work for Palmetto Health;

(d)    engage third parties to assist the Providence Physicians and 330 Providence employees with pursuing business opportunities with Palmetto Health;

(e)    take competitive action to Providence's detriment and to Palmetto Health's benefit during the time that Hall, Frick, Pace, Presnal and Locke were on Providence's payroll;

(f)    misappropriate Providence's proprietary and confidential information and trade secrets; and

(g)    encourage or permit Providence Physicians and Providence employees to meet with representatives or business partners of Palmetto Health while still employed by Providence.

280.    The Defendants willfully took these actions with knowledge that Hall, Frick, Pace, Presnal, and Locke were employed by and owed fiduciary duties to Providence and with knowledge that their actions would cause harm to Providence, to Defendants' personal benefit and to the benefit of Palmetto Health and PPH.

281.    By all of their actions as described herein, the Defendants knowingly participated in, assisted, and encouraged a breach of fiduciary duties by Hall, Frick, Pace, Presnal, and Locke.

282.    As a direct and proximate result of the negligent, wanton, heedless, wrongful, reckless, improper, intentional, and/or illegal actions of the Defendants, Providence has suffered actual damages and is entitled to recover such damages.

283.    Defendants' aiding and abetting breaches of fiduciary duty was willful, wanton or with reckless disregard of the rights of Providence, entitling Providence to an award of punitive damages.

## COUNT 15 - BREACH OF DUTY OF LOYALTY

### (Against Defendants Hall, Frick, and Pace)

284.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 283 of this Complaint.

285.    Defendants Hall, Frick, and Pace owed Providence a duty of loyalty and good faith to refrain from acting in any manner inconsistent with Providence's interests while they were employed by Providence

286.    Defendants Hall, Frick, and Pace each negligently, wantonly, heedlessly, wrongfully, recklessly, improperly, intentionally, and/or illegally breached his duty of loyalty to Providence by, among other things:

(a)    meeting with and pursuing business opportunities with Palmetto Health on behalf of the Providence Physicians and failing to work to protect Providence's interest in retaining the services of those physicians for Providence and its patients;

(b)    assisting with developing a strategy to convince the Providence Physicians and Providence employees to leave Providence and join Palmetto Health;

(c)    soliciting Providence's employees and Providence Physicians, while employed by Providence on a full-time basis, to leave the employ of Providence and work for a competing hospital system;

(d)    engaging third parties to assist the Providence Physicians and Providence employees with pursuing business opportunities with Palmetto Health;

(e)    accessing, obtaining, disclosing, and misappropriating Providence's proprietary and confidential business;

(f)    devoting time, effort, and resources to a business which competes with Providence, Palmetto Health, while employed by Providence on a full-time basis;

(g)    diverting Providence's equipment and resources to his own benefit and use while employed by Providence on a full-time basis; and

(h)    soliciting Providence's vendors, while employed by Providence on a full-time basis, to perform the same or similar services in direct competition with Providence.

287.    As a direct and proximate result of the Defendants' conduct as set forth herein, Providence has suffered actual damages and is entitled to recover such damages from Defendants, in addition to any amounts paid to Defendants as wages for the period in which they engaged in disloyal acts.

288.    Providence is also entitled to recover punitive damages from Defendants Hall, Frick, and Pace as a result of their knowing, willful, and intentional misconduct.

## COUNT 16 - BREACH OF CONTRACT

### (Against Defendants Taylor and Practice Partners in Healthcare)

289.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 288 of this Complaint.

290.    The PPH Agreement constitutes a valid and binding contract between Providence and PPH.

291.    The PPH Agreement includes an implied duty of good faith and fair dealing in the performance of contractual obligations.

292.    Under Section 3.2 of the PPH Agreement, PPH expressly agreed that "PPH shall act in good faith to perform its obligations hereunder."

293.    PPH and Taylor materially breached the implied duty of good faith and fair dealing and Section 3.2 by engaging in conduct specifically prohibited by the PPH Agreement, reflecting bad faith in the performance of their contractual obligations, and by knowingly and willfully breaching the PPH Agreement despite being knowledgeable of its terms.

294.    As a direct and proximate result of PPH's and Taylor's material breach of the PPH Agreement, Providence has suffered and will continue to suffer actual damages.

295.    As a direct and proximate result of PPH's and Taylor's material breaches of the Agreement, Providence is entitled to recover its actual damages from Defendants PPH and Taylor.

## COUNT 17 - MISAPPROPRIATION OF CONFIDENTIAL AND PROPRIETARY INFORMATION

### (Against Defendants Palmetto Health, Hall, Frick, and Pace)

296.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 295 of this Complaint.

297.    As set forth above, upon information and belief Palmetto Hall, Frick, and Pace have willfully misappropriated confidential and proprietary information owned by Providence, including without limitation information regarding (1) Providence's general financial condition, (2) Providence's financial information regarding non-orthopedic practices/service line, (3) Providence's financial information regarding orthopedics including revenues and volumes, (4) Providence's employees, benefits and compensation, and (5) Providence's strategic information, all of which constitute trade secrets as defined in the South Carolina Trade Secrets Act, S.C. Code § 39-8-10 *et seq*.

298.    Defendants Palmetto Hall, Frick, and Pace misappropriated information for the benefit of the Defendants and to the detriment of Providence and its exclusive interest in all such proprietary information.

299.    Defendants Palmetto Hall, Frick, and Pace willfully assumed possession of and misappropriated Providence's trade secrets by disclosing and/or using Providence's trade secrets knowing that they acquired such trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

300.    As a direct and proximate result of these Defendants' willful misappropriation of Providence's trade secrets, Providence has suffered actual damages, and the Defendants have been unjustly enriched.

301.    As a direct and proximate result of these Defendants' willful misappropriation of Providence's trade secrets, Providence seeks an award of actual damages, including, but not limited to, the value of the unjust enrichment caused by the Defendants' misappropriation and benefit therefrom.

302.    As a direct and proximate result of these Defendants' willful misappropriation of Providence's trade secrets, Providence also seeks an award of treble damages and attorneys' fees as permitted by the South Carolina Trade Secrets Act.

## COUNT 18 - TORTIOUS OR INTENTIONAL INTERFERENCE WITH CONTRACT

### (Against All Defendants)

303.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 302 of this Complaint.

304.    Providence had written Employment Agreements with the Providence Physicians. The employment agreements required those physicians to avoid any conduct that might "be detrimental" to the interests of Providence and also to refrain from disclosing confidential information of Providence.

305.    The Defendants knew of the Employment Agreements.

306.    The Defendants have intentionally procured or attempted to procure the breach of the Employment Agreements by soliciting Providence Physicians to work to transfer Providence's Moore Clinic orthopedic business line to Palmetto Health, including its clinical staff, patients, assets and name, and to provide Palmetto Health with Providence's confidential information.    In doing this, Defendants have acted intentionally and tortiously without justification.

307.    As a direct and proximate result of the Defendants' interference with the Employment Agreements, Providence has suffered actual damages.

308.    The actions of Defendants in tortiously interfering with Providence's contracts and business expectancies were willful and wanton or with reckless disregard for the rights of Providence, entitling Providence to an award of punitive damages.

## COUNT 19 - INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS OR ADVANTAGE

### (Against All Defendants)

309.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 308 of this Complaint.

310.    The Defendants were aware that Providence had been in contact with prospective buyers of Providence.

311.    The Defendants also had knowledge of Providence's negotiations and potential future contractual relationship with LifePoint regarding a sale to LifePoint that would include Providence's Moore Clinic line of business.

312.    The Defendants intentionally, maliciously, and fraudulently interfered with Providence's prospective contractual relationship with LifePoint.

313.    The Defendants' actions have caused the failure of prospective contractual relationships and caused Providence to suffer actual damage.

314.    The actions of Defendants in tortiously interfering with Providence's prospective contractual relationship were willful and wanton or with reckless disregard for the rights of Providence, entitling Providence to an award of punitive damages.

## COUNT 20 - CIVIL CONSPIRACY

### (Against All Defendants)

315.    Providence realleges and incorporates by reference the allegations in Paragraphs 1 through 314 of this Complaint.

316.    The Defendants have acted in concert and combined with each other to further a conspiracy to harm Providence by committing the wrongful acts discussed herein.

317.    The document that Taylor prepared in February 2015 as part of the conspiracy specifically discussed "timing and coordination" of Hall's resignation with the Providence Physicians' 90 day resignation notice.

318.    On April 10, 2015, John Singerling of Palmetto Health publicly announced that Hall would be joining Palmetto Health on April 27, 2015 as the Vice President of Orthopedic Services.

319.    On April 28, 2015, John Singerling of Palmetto Health publicly announced that Palmetto Health was acquiring the Providence Physicians, even though the deal between Palmetto Health and the Providence Physicians had not been completely finalized, so as to ensure that LifePoint would know of it on April 28, 2015, the day of Providence's board meeting.

320.    In addition to the matters alleged above, as part of the conspiracy,

(a)    Defendant Hall, affirmatively deceived Providence about what he and the Providence Physicians intended to do for Palmetto Health when Defendant Hall delivered his resignation letter to Providence on March 27, 2015 but delayed its effectiveness until April 24, 2015;

(b)     the other Individual Defendants concealed from Providence their knowledge about what Hall intended to do when he joined Palmetto Health and about the intentions of the Providence Physicians;

(c)     because of the deception of the Individual Defendants, Defendant Hall obtained continued access to Providence's confidential information, communications systems, and employees for a time while he affirmatively worked to the detriment of Providence and to the benefit of Palmetto Health to achieve the objectives of the conspiracy;

(d)     Defendants intentionally timed the resignations of Frick and Pace and deceived Providence about their intentions so that they would remain at Providence even after the Providence Physicians had submitted their resignations so as to enable them to maintain access to Providence's information and employees so as to maximize the damage to Providence and achieve the objectives of the conspiracy;

(e)     Defendants specifically timed and delivered the resignation of the Providence Physicians so that it would have the maximum disruptive impact on Providence's plan to sell to LifePoint and on Providence's ability to retain its employees associated with its Moore Clinic orthopedic line of business;

(f)     Defendant Hall, and on information and belief, the other Defendants collectively worked together to ensure that the timing and manner of the departure of the Providence Physicians and their resignation would have the maximum detrimental impact on Providence's ability to negotiate with LifePoint and retain the services of its employees associated with its Moore Clinic line of business;

(g)     based on their awareness that Providence had scheduled a board meeting for April 28, 2015 to approve the signing of a letter of intent for the acquisition of Providence

including the Moore Clinic line of business by LifePoint, Defendants conspired to time and have delivered the resignation of the Providence Physicians, effective 90 days thereafter, on the morning of April 28, 2015, just prior to the Providence board meeting where the Providence board was scheduled to accept LifePoint's offer to purchase.

321.     Upon information and belief, the wrongful acts that the Defendants conspired to perform include, without limitation:

(a)     forming a plan to disrupt and sabotage the sale of Providence including its Moore Clinic line of business;

(b)     soliciting and inducing Providence's 330 employees to leave Providence for Palmetto Health;

(c)     sabotaging Providence's ability to retain a competitive position in the provision of orthopedic services;

(d)     attempting to dilute the quality of Providence's reputation and services;

(e)     intentionally misrepresenting the true nature and purpose of their acts in a fraudulent effort to avoid detection; and

(f)     other acts as may be revealed in the course of discovery.

322.     Upon information and belief, the purpose of and/or the reasonable and/or expected result of and/or the ultimate effect of Defendants' civil conspiracy was to injure Providence and to benefit the Defendants.

323.     Providence has suffered special damages as a direct and proximate result of the aforesaid civil conspiracy and is entitled to recover such damages from the Defendants.  The special damages include, without limitation, (a) damage to Providence's relationship with the clinical staff  of its Moore Clinic line of business and its negotiating position with LifePoint

regarding the departure of the Providence Physicians  that is substantially greater than the damage that would have occurred had Hall, Frick, and Pace not deceived Providence about their intentions  and the intentions of the Providence Physicians and had the timing and method of communication of the resignation of the Providence Physicians been different and (b) substantial expenses incurred by Providence investigating the acts of the Former Providence Executive Defendants during the time between March 27, 2015 when Hall announced his resignation and April 28, 2015 when the Providence Physicians resigned en masse, and also the period between April 28, 2015 and the date in June 2015 when Frick and Pace announced their resignations.

324.    The actions of Defendants, in combining and conspiring to commit the wrongful acts set forth herein, were and are willful and wanton or with reckless disregard for the rights of Providence, entitling Providence to an award of punitive damages.

### PRAYER FOR RELIEF

Plaintiffs request that the Court:

(a)    Declare that Defendants' conduct as alleged in Causes of Actions 1 through 11 (the "Antitrust Causes of Action") constitutes violations of the Clayton Act § 7 and the Sherman Act, 15, U.S.C. §§ 1 and 2.

(b)    Award plaintiff treble actual damages in an amount to be determined at trial in respect the Antitrust Causes of Action and Causes of Action 12 (the "Unfair Trade Practice Cause of Action") and 17 (the "Trade Secrets Act Cause of Action")

(c)    Award all compensatory and statutory damages to Plaintiffs in an amount to be determined at trial in respect to the other causes of action;

(d)    Award punitive damages, including treble and/or exemplary damages, in an appropriate amount;

(e)    Award Plaintiffs all costs incurred in this action together with reasonable attorneys' fees and expenses, including any necessary expert fees as well as pre-judgment and post-judgment interest;

(f)    Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

**WYCHE, P.A.**

s/John C. Moylan
_____
John C. Moylan (D.S.C. Id. No. 5431)
Matthew T. Richardson (D.S.C. Id. No. 7791)
Alice W. Parham Casey (D.S.C. Id. No. 9431)
801 Gervais Street, Suite B (29201)
P. O. Box 12247
Columbia, SC  29211-2247
Telephone: (803) 254-6542
Telecopier: (803) 254-6544
jmoylan@wyche.com; mrichardson@wyche.com
tcasey@wyche.com

Henry L. Parr, Jr. (D.S.C. Id. No. 2984)
Wallace K. Lightsey (D.S.C. Id. No. 1037)
Christopher B. Schoen (D.S.C. Id. No. 11421)
44 East Camperdown Way
Greenville, S.C. 29601
Telephone:  864-242-8200
Telecopier:  864-235-8900
E-mail:  hparr@wyche.com; wlightsey@wyche.com;
cschoen@wyche.com

Dated:  August 17, 2016        ATTORNEYS FOR PLAINTIFFS SCPH LEGACY
                               CORPORATION AND POD LEGACY, LLC